FILED

03/19/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 4, 2020 Session

## STATE OF TENNESSEE v. KELLUM JORDAN WILLIAMS AND KEVIN RAYNARD FORMAN

**Appeal from the Circuit Court for Montgomery County**
**No. CC-16-CR-787 Jill Bartee Ayers, Judge**

_____

**No. M2019-01480-CCA-R3-CD**

_____

A Montgomery County jury convicted the defendants, Kellum Jordan Williams and Kevin Raynard Forman, of first degree premeditated murder, first degree felony murder, and especially aggravated kidnapping. The trial court merged the defendants' convictions for premeditated murder and felony murder and imposed a sentence of life without the possibility of parole. The trial court imposed a sentence of twenty-five years for especially aggravated kidnapping to be served consecutively to the murder sentence. On appeal, both defendants challenge the sufficiency of the evidence. Defendant Williams also challenges the length of his sentence. Defendant Forman raises additional issues, asserting that the trial court erred when it: (1) denied his motion to sever; (2) denied his motion to suppress; and (3) admitted evidence in violation of Tennessee Rule of Evidence 404(b). After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

Chase T. Smith, Clarksville, Tennessee, for the appellant, Kellum Jordan Williams.

Brian E. Price and Stephanie D. Ritchie-Mize, Clarksville, Tennessee, for the appellant, Kevin Raynard Forman.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Robert J. Nash and Arthur F. Bieber, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the kidnapping and murder of the victim, Amy Murphy. For their role in these offenses, a Montgomery County grand jury indicted the defendants for first degree premeditated murder, first degree felony murder, and especially aggravated kidnapping. Sandra Misfeldt-Murphy, Carol Williams, and Ernest Poe were also charged for their involvement.

## A. Pretrial Motions

Defendant Forman filed multiple pretrial motions in this case. As relevant to this appeal, Defendant Forman filed: (1) a motion for severance of the defendants' cases; (2) a motion to suppress evidence seized from Defendant Forman's apartment; and (3) a motion to prevent the State from introducing evidence of Defendant Forman's and the victim's January 26, 2015 arrests ("January 26 arrest").

### 1. Motion to Sever

Defendant Forman's motion for severance asserted that Defendant Forman could not receive a fair trial if he was tried jointly with Defendant Williams. He contended that Defendant Williams had provided statements to the police that, if entered at trial, would prevent him from cross-examination and thereby violate his rights under the Confrontation Clause. At the hearing, the State announced that it would not be entering Defendant Williams's statements to the police.

### 2. Motion to Suppress

Defendant Forman's motion to suppress sought to exclude any evidence recovered from his apartment during execution of a February 4, 2015 search warrant and a February 19, 2015 search warrant. In his motion and argument at the hearing, Defendant Forman asserted that the search warrant lacked particularity. The motion identified the reference in the search warrant to: "human hair, human tissue, human bone fragments, human teeth, human blood, and latent fingerprint." Defendant Forman argued:

> The search warrants fail to specifically set forth as to which exact person or people are expected to be linked or matched to the items listed above. This lack of specificity is too general and creates a broad exploratory search which violates both the United States Constitution and the Tennessee Constitution.

At the suppression hearing, Defendant Forman's attorney argued:

> The search warrant fails to set forth which exact person or people are expected to be linked or matched to the items listed[ ]. This lack of specific

detail is too general and creates a broad search warrant which essentially gives the State the means for which to do just a general broad search. There is no specific and particular people that they believe will match the particular DNA evidence that is sought to be found. So, therefore, the warrant is invalid because the particularity prong of the search warrant requirement has not been met. Again, what the State has simply done is they simply said we are looking for human bone fragments, human tissue, human hair, human teeth, human blood, [and] latent fingerprints [ ] but there is no particular and exact people they are looking to match with those DNA or forensic evidence that they are looking for.

The State responded that the warrant specified that the officers were searching for human blood, and they recovered items containing human blood. The State argued that there was no requirement that officers identify the DNA of the blood before DNA testing was conducted. The trial court made the following findings when it denied Defendant Forman's motion to suppress:

The Court finds that the property that was sought in each of the warrants was described in the warrant and recovered. I find no case requiring any more particularity with regard to identifying a person to whom such DNA type evidence would belong and again, I think the Lee [c]ase is what is on point, because it would be unnecessary and really impossible in this case for them to know, even if it named a person, there would be no way to identify that it is that person's DNA evidence before it is removed unless there is some kind of testing on the spot. And again, I find no law requiring any more particularity than what is in the warrant and therefore, the motions are denied.

### 3. Motion to Exclude Evidence of January 26 Arrest

Defendant Forman argued that the State should not be allowed to introduce evidence of his January 26 arrest. Defendant Forman and the victim were in a car together when they were stopped by the police. During the course of the stop, police officers found drugs inside the car and arrested Defendant Forman and the victim. He argued that the potential probative value did not outweigh the prejudicial effect of admission of the arrest. Finding the arrest relevant to the issues of motive and intent, the trial court denied Defendant Forman's motion and allowed the State to present evidence of the January 26 arrest.

### B. Trial

At trial, the parties presented the following evidence: On February 1, 2015, the Adams Fire Department responded to a report of a fire on Highway 76 next to Hills Mills

in Montgomery County, Tennessee. The firemen arrived at around 5:45 a.m. and found a small fire burning in a field. Maurice Brown, a volunteer firefighter, initially believed the source of the fire was two burning logs. As he walked closer to the fire, he realized the fire was not burning logs but a human body. Firefighters used as little water as possible to extinguish the fire in an effort to preserve evidence. Mr. Brown then called dispatch and requested the Sheriff's Department.

Robertson County Sheriff's Office ("RCSO") deputies arrived at the crime scene at 7:17 a.m. An "open" tent had been set up over the body, which lay in a field, in an effort to protect evidence from the rain. The upper portion of the body was burned significantly, but, based upon size, law enforcement believed the body was a female, later identified as the victim ("the victim").[1] Tennessee Bureau of Investigation ("TBI") Agents collected evidence from the crime scene. The evidence collected included: a ratchet strap with a red strap, a portion of a tarp, and a ring from the victim's finger. TBI Agents also photographed and collected an impression of a tire track found in the field. In the area around the victim, law enforcement collected grommets, parts of ratchet straps and hooks associated with ratchet straps, burned bedding, and burned and melted pieces of a tarp. After removal of the victim's body, melted tarp, fabric, and a buckle were collected from the area underneath the victim's body. TBI Special Agent Melinda Quinn collected soil from between the victim's legs, an area near the victim's head, and under the victim's torso for the purpose of testing for the presence of accelerants.

TBI Investigator James Scarbro became involved with this case on February 1, 2015. When he arrived at the crime scene, it was cold and rainy. From the road, he could see a burnt area in the field. As he walked into the field, he observed a red ratchet strap or buckle located near the victim's body, several "eyelets" or "grommets" found on tarps, and a piece of a tarp. After observing these items, Investigator Scarbro went to a local Walmart store, approximately seven miles from the field, where he noticed red ratchet straps on a shelf and, within close proximity to the ratchet straps, brown tarps consistent with the items collected at the crime scene. He requested a loss prevention employee search the universal product code for those items to ascertain how many had been purchased within the last twenty-four hours. Two ratchet straps and two tarps had been sold during that time period. All four of those items were purchased at the same time, on the same receipt. The store manager provided Investigator Scarbro copies of the receipt. The receipt indicated that it was a cash purchase. Since the purchase was not made with credit cards that might identify the buyer, Investigator Scarbro obtained the Walmart surveillance video for the relevant time period. He identified still photographs of the defendants from the surveillance video footage.

---

[1] The parties stipulated that the recovered body was the victim.

In the days following discovery of the victim's body, Investigator Scarbro's investigation revealed the identity of Sandra Misfeldt-Murphy ("Ms. Murphy"). Investigator Scarbro did not know whether Ms. Murphy was another victim or if she was complicit in the crimes, so he began trying to locate her. A family member provided a phone number and, when Investigator Scarbro called the number, Ernest Poe answered. Investigator Scarbro arranged to meet with Mr. Poe at a McDonald's restaurant. When Mr. Poe arrived, Noah Beck was with him driving a green Ford van. Mr. Poe provided no information and left abruptly after Investigator Scarbro displayed photographs of the defendants. Later, Mr. Poe initiated contact with Investigator Scarbro and disclosed that, on the night of January 31, 2015, he had arranged for the defendants to borrow the green Ford van from Mr. Beck. Based upon this information, Investigator Scarbro seized the green Ford van.

Ms. Murphy, the victim's niece, testified that she moved to Clarksville, Tennessee, in December 2014 and lived with the victim and the victim's three children. After living with the victim for about a month, Ms. Murphy moved into Defendant Forman's apartment ("the Ashford Place apartment") at the Ashford Place apartment complex. Ms. Murphy testified that she had an intimate relationship with Defendant Forman. She described her relationship with Defendant Williams as "business partners," explaining that they sold drugs together. Ms. Murphy testified that she also had sexual relations with Defendant Williams, who was married at the time. Defendant Forman, Defendant Williams, and Ms. Murphy sold "Molly," cocaine, Xanax, and marijuana. Ms. Murphy participated in preparing the drugs for sale and also used the drugs.

One day in January, Ms. Murphy was babysitting the victim's youngest child at the Ashford Place apartment when she received a call from the victim. The victim asked Ms. Murphy to bring her child home because a Department of Children's Services ("DCS") representative was at the victim's home and wanted to see all of the victim's children. At the time, Ms. Murphy had outstanding warrants for her arrest, so she did not want to return the child home for fear of arrest. Consequently, Defendant Forman drove the child home while Defendant Williams and Ms. Murphy remained at the Ashford Place apartment. Later, the victim called Defendant Williams to explain that, after returning the child home, Defendant Forman drove the victim to the DCS office. During the drive, Defendant Forman had been stopped by the police, and the police arrested Defendant Forman and the victim for drugs found in the vehicle.

The victim sent Ms. Murphy a message through Facebook after she was released from jail on January 30, 2015. The two women prepared for a night out at the victim's house and then drove to the Night Deposit, a local bar. The women stayed out all night and, when they returned to the victim's house the next morning, they found the front door

kicked open and the victim's home in disarray. The victim notified the police and filed a police report. After filing the police report, the two women drove to Walmart where the victim withdrew money to pay the victim's bondsman and then returned to the victim's home. The victim began "inspecting" the house and sorting through the "wreck" that had been created during the burglary before driving to the Ashford Place apartment.

Based upon the burglary of the victim's home, Ms. Murphy intended to pack her belongings and return to living with the victim. When they arrived at the Ashford Place apartment, Ms. Murphy's key to the apartment no longer worked, so she began beating on the door. Defendant Williams opened the door, and Ms. Murphy walked inside past Defendant Williams toward the linen closet. The victim also entered and asked Defendant Williams about her $500. Ms. Murphy took her bags from the linen closet and went to the bedroom to pack. Defendant Forman came into the bedroom and asked Ms. Murphy what she was doing. Ms. Murphy replied that she was packing her belongings, and Defendant Forman left the room.

As Ms. Murphy packed, she heard a "thud," consistent with someone being flung against a wall. Ms. Murphy looked into the hallway and saw Carol Williams, Defendant Williams's wife, and the victim fighting in the hallway. Ms. Murphy did not feel the need to intervene because she believed the fight was well-matched, so she returned to packing. As she finished packing, she heard the two women arguing. Ms. Murphy recalled that she had used drugs earlier in the day and was drunk. She stated that her focus was on leaving the apartment and for she and the victim to continue with their day.

Ms. Murphy walked into the kitchen where the defendants, the victim, and Ms. Williams had gathered. Ms. Williams was calling the victim a "jump-off," which Ms. Murphy indicated meant a "slut" or a "side b**ch." Ms. Murphy interjected, urging the women to continue their argument over the phone. The victim was disheveled at this point, but Ms. Murphy observed no signs of injury. Ms. Murphy and Defendant Forman walked out of the kitchen. As she exited, she heard Defendant Williams say "something about getting hit with a hammer." Defendant Forman went into the bathroom, and Ms. Murphy returned to the bedroom and sat in a chair.

Ms. Murphy testified that Ms. Williams entered the bedroom and began casually talking about Ms. Murphy's family, including specific addresses for her parents. Ms. Murphy was bewildered, because she had seen Ms. Williams before, but they were not familiar with one another. Ms. Williams took Ms. Murphy's phone and the victim's van keys. Ms. Williams told Ms. Murphy that to ensure Ms. Murphy was not wearing "a wire," Ms. Williams would strip search Ms. Murphy. Ms. Murphy complied and, as she redressed, she heard the victim crying. She could also hear the defendants' voices, but she

was unable to discern what they were saying. After dressing, she sat in the chair again as Ms. Williams frequently looked out the bedroom door while making casual conversation.

As she sat in the bedroom, Ms. Murphy heard what she described as a "grunt" and then a "thud" followed by another "grunt." She then heard Defendant Williams say, "I just punched this b**ch in the ribs. Bro, it's your turn." Ms. Murphy did not know how long she remained in the bedroom with Ms. Williams, but she recalled hearing running water, a gasp, and then it was silent. Thereafter, the defendants entered the bedroom. Ms. Murphy recalled that Defendant Forman was quiet, and Ms. Williams said, "this is for life." Defendant Williams laughed, glanced toward the door, and said, "Well, the bitch is dead."

Ms. Murphy recalled that Defendant Williams wore white Nike shoes and baggy gray sweatpants with a red "wife-beater" and black gloves. Mr. Forman wore black boots with dark jeans, and a navy-colored hoodie. He also wore black gloves with yellow stitching and grey Velcro straps. Defendant Williams and Ms. Williams began expressing concern that "they," an unidentified third party, knew that the victim and Ms. Murphy were at Defendant Forman's apartment. Ms. Murphy exited the bedroom with the others and went into the living room area. As she walked through the apartment, she saw the victim lying face down and naked on the kitchen floor. The victim's hands were zip-tied behind her back and her ankles were zip-tied. The victim's legs were inside a white trash bag with the draw string pulled. Ms. Murphy observed blood coming from the victim's right ear and pooled blood near the victim's midsection. Ms. Murphy continued to the living room while the defendants went into the kitchen and discussed what to do with the victim. She heard Defendant Williams suggest either cutting the victim into pieces or disposing of her body in a wooded area.

Due to concern about a third person's knowledge of Ms. Murphy and the victim's presence at the apartment, Ms. Murphy drove the victim's van to the victim's house. Ms. Williams met Ms. Murphy at the victim's house, and they drove in Ms. Williams's van to Ms. Williams's house ("Allenwood Drive"). When Ms. Murphy entered Ms. Williams van, she saw that Ms. Williams had the victim's cell phone. Ms. Williams took the victim's phone apart, and Ms. Murphy threw the three separate pieces out the van window as they drove. Later, during the investigation of these crimes, Ms. Murphy showed police the area where she disposed of the victim's phone, and the police found the victim's phone.

Shortly after Ms. Williams and Ms. Murphy arrived at Allenwood Drive, the defendants arrived and took Ms. Williams's van. They returned later with a black trash bag. According to Ms. Murphy, the trash bag contained the victim's clothes. Ms. Williams drove Ms. Murphy to a dumpster located near Golf Club Lane, and Ms. Murphy put the garbage bag with the victim's clothing in the dumpster. When the women returned to Allenwood Drive, the defendants were gone and did not return for "some hours." Ms.

Murphy testified that she did not try to leave and stayed at Allenwood Drive for three or four days before returning to the Ashford Place apartment. She lived with Defendant Forman at the Ashford Place apartment for a period of time until the couple moved to "Ballygar."

After being charged in this matter, Ms. Murphy returned to Colorado to address pending charges and then to Missouri to stay with her mother. While in Missouri, Defendant Williams called Ms. Murphy. Ms. Murphy interpreted their conversation as Defendant Williams asking her to lie for him. The State played an audio recording of the phone call for the jury. Ms. Murphy identified her voice and that of Defendant Williams.

On cross-examination by Defendant Forman's attorney, Ms. Murphy confirmed that both she and the victim had engaged in an intimate relationship with Defendant Williams. Although Ms. Williams never confronted Ms. Murphy about her interaction with Defendant Williams, Ms. Murphy believed Ms. Williams was aware of Defendant Williams's extra-marital affairs. Ms. Murphy had been present during prior arguments between Ms. Williams and the victim about the victim's relationship with Defendant Williams. Ms. Murphy estimated that the dispute between the victim and Ms. Williams had been ongoing since November 2014.

Ms. Murphy clarified that when the defendants brought the black trash bag with the victim's clothes to Allenwood Drive, it was Defendant Williams who held the bag and gave it to Ms. Williams. Ms. Murphy confirmed that she believed the victim was dead when she saw her lying naked, with her hands and feet bound, on the kitchen floor.

On cross-examination by Defendant Williams's attorney, Ms. Murphy confirmed that she gave four police statements: February 18, 2015, February 20, 2015, March 6, 2015, and in October 2015. Ms. Murphy agreed that her statements to the police over the course of 2015 developed, and that she provided more information with each statement. Ms. Murphy confirmed that Ms. Williams was angry with the victim over her affair with Defendant Williams and that both Defendant Williams and Ms. Williams blamed the victim for Defendant Forman's January 26 arrest.

Ms. Murphy recalled that, during the events at the Ashford Place apartment, Ms. Williams told Ms. Murphy that she wanted Ms. Murphy dead "too." Defendant Williams intervened, assuring Ms. Williams that Ms. Murphy was "cool people" and would not do what the victim had done. Ms. Murphy agreed that, even after Ms. Williams stated she wanted Ms. Murphy dead, Ms. Murphy still participated in disposing of evidence. She explained that her participation was due to her fear of Ms. Williams and the defendants.

Ms. Williams testified that, in January 2015, she and Defendant Williams were not living together but were working on their marriage. After Ms. Williams learned of Defendant Williams's affair with the victim, Defendant Williams moved out of the marital home on Allenwood Drive into the Ashford Place apartment. Ms. Williams noted that Defendant Williams had engaged in "[n]umerous" affairs over the course of their fifteen-year marriage. Ms. Williams confirmed that Defendant Williams sold marijuana, cocaine, "Molly," and pills. She said that Defendant Forman was also engaged in the enterprise, selling marijuana and "Molly." Ms. Williams participated in their drug business by preparing the "Molly" for sale. She admitted to drug use and stated that her drug of choice was powder cocaine.

Ms. Williams recalled the events of January 31, 2015. She stated both she and Defendant Williams had used drugs that morning before driving to the Ashford Place apartment. The defendants wanted to change the apartment door lock, so Ms. Williams drove the defendants to Walmart to purchase a new lock. The defendants believed that the victim had played a role in Defendant Forman's January 26 arrest, and they wanted to prevent her from entering the Ashford Place apartment. After the door lock was changed, Ms. Williams went to the store. While she was out, Defendant Williams called her cell phone and told her not to return to the apartment because the victim and Ms. Murphy were coming to the apartment. Upon learning this, Ms. Williams immediately returned to the apartment and found Defendant Forman and Ms. Murphy talking in their bedroom. In the other bedroom, Defendant Williams and the victim were talking about why the victim had "set [Defendant Forman] up" in reference to the January 26 arrest. Defendant Williams and the victim walked out of the room into the hallway, and Ms. Williams entered the hallway where she and the victim engaged in a physical fight. The fight moved into the kitchen area where Defendant Williams separated the two women. The victim landed on the floor when Defendant Williams intervened. Ms. Williams exited the kitchen and went to the bedroom Defendant Forman and Ms. Murphy shared.

Ms. Williams testified that Ms. Murphy was in the bedroom, and Defendant Forman was in the kitchen with Defendant Williams and the victim. Ms. Williams heard the victim saying, "Stop. Please stop hitting me." Ms. Williams remained in the bedroom talking with Ms. Murphy. Based upon the sounds she heard coming from the kitchen, she believed the defendants were hitting the victim. At some point, Defendant Williams joined the women in the bedroom while Defendant Forman remained in the kitchen with the victim. During this time, Ms. Williams heard gasping noises coming from the kitchen. She could not see inside the kitchen but believed Defendant Forman was in the kitchen and that the gasping noises came from the victim. After some time, Defendant Williams returned to the kitchen, and then both defendants came to the bedroom and began considering what they should do with Ms. Murphy. When Ms. Murphy did not respond to the defendants, Ms. Williams told Ms. Murphy that she could come home with Ms. Williams. Ms.

Williams estimated that she stayed in the bedroom for an hour or two. When she came out of the bedroom, she saw the unclothed victim lying on the kitchen floor. She recalled that it appeared there was a "little" pooling of blood near the victim's head.

Ms. Williams testified that, after leaving the bedroom, she, Ms. Murphy, and the defendants discussed how to return the victim's van[2] to her residence. Ms. Murphy had the victim's keys, and Ms. Williams had the victim's cell phone. Ms. Murphy drove the victim's van to the victim's house while Ms. Williams went home to get her own van and then drove to the victim's residence. The women returned to Allenwood Drive together in Ms. Williams's van. During the drive, Ms. Williams removed the battery from the victim's cell phone, and the women disposed of the phone along the road. The defendants arrived at Allenwood Drive shortly after Ms. Williams and Ms. Murphy. Defendant Williams retrieved $200 from a safe and the defendants left again. The defendants returned later and Defendant Williams told Ms. Williams that he needed to find a truck. He made a phone call on Ms. Williams's cell phone, telling someone he was "on his way," before leaving a second time. She did not see the defendants again until 5:30 a.m.

Ms. Williams testified that, during one of the times the defendants were briefly at Allenwood Drive that night, they gave her their shoes and that she and Ms. Murphy disposed of the shoes in a dumpster on Paradise Hill. When the defendants returned to the apartment at 5:30 a.m., they retrieved towels to clean Mr. Forman's apartment. Once the two men were back at Allenwood Drive after cleaning the Ashford Place apartment, Defendant Williams wrote Ms. Williams a note, stating that the defendants had "burned her." No further conversation about the victim followed. Ms. Murphy stayed with Ms. Williams for three days and then returned to the Ashford Place apartment. Ms. Williams confirmed her agreement with the State to serve fifteen years for facilitation of first degree murder for her role in these crimes.

On cross-examination by Defendant Forman's attorney, Ms. Williams testified that she had been around the victim twice: on January 31 and on another occasion in the Ashford Place apartment parking lot. About their interaction in the parking lot, Ms. Williams recalled that she was waiting in the Ashford Place parking lot when the victim and Defendant Williams arrived. Upon seeing Ms. Williams, Defendant Williams told the victim to beat up Ms. Williams.

About her earlier testimony, Ms. Williams clarified that, on the day of the victim's death, it was Defendant Williams who sent Ms. Williams out of the kitchen to the bedroom with Ms. Murphy after he intervened in the women's physical altercation. Ms. Williams

---

[2] The victim's vehicle is intermittently referred to as a "van" and as a "truck." In this opinion, for consistency, we refer to it as a van.

denied taking Ms. Murphy's phone or strip searching her. When questioned about some of the details of Ms. Murphy's testimony, Ms. Williams denied that Defendant Williams was laughing in the bedroom after the victim went silent or that she called the victim names during that time. She further denied that the black garbage bag Defendant Williams gave her contained the victim's clothes and that she and Ms. Murphy disposed of those clothes. She explained that Defendant Williams gave her an empty garbage bag for the defendants' shoes. She put the shoes in the garbage bag and then she and Ms. Murphy disposed of the garbage bag. Ms. Williams agreed that during this time period, Defendant Williams was using "a lot" of drugs and had become paranoid. Ms. Williams agreed that Defendant Williams had held a gun to her head and her son's head, threatening to kill her, "if it wasn't for the kids[.]"

Ms. Williams denied threatening Ms. Murphy or stating that she wanted to kill her. She agreed that she believed the victim was "ruining" Ms. Williams's family and confirmed that, a few days before the murder, she had sent threatening text messages to the victim; however, she maintained that she had not killed the victim.

On cross-examination by Defendant Williams's attorney, Ms. Williams testified that the victim was bleeding and the blood had begun pooling. The victim had a clear plastic bag on her feet but her hands were not zip-tied. She stated that there was no discussion about what to do with the body at that time; rather, Ms. Williams and Ms. Murphy returned the victim's van to the victim's residence and destroyed the victim's cell phone. She admitted that by doing so she had tampered with evidence. Ms. Williams estimated that the defendants came to the Williams's residence at around 10:30 p.m., at 1:00 a.m., and then again at 5:30 a.m.

On redirect examination, Ms. Williams testified that, during the investigation of this case, she drove Defendant Williams to a TBI interview. After the interview, Defendant Williams asked her to drive him to Walmart to buy ratchet straps. According to Ms. Williams, Defendant Williams said that he wanted ratchet straps at Allenwood Drive in case the police searched the residence. At Walmart, Defendant Williams purchased green ratchet straps. Next, Defendant Williams asked Ms. Williams to drive him to Shelton Circle. Ms. Williams explained that she and Defendant Williams owned a cleaning business and one of the accounts was an apartment located on Shelton Circle. Defendant Williams went into the apartment "[t]o touch everything" in case the police dusted the apartment for fingerprints.

Ms. Williams testified that, when she saw the victim lying on the kitchen floor, she thought the victim was dead; however, no one checked the victim's vital signs or rendered aid to the victim. Ms. Williams denied using any type of weapon during the physical fight

with the victim in the apartment hallway. She said that, after Defendant Williams separated the women, the victim was "okay."

Noah Beck was at the Night Deposit on the night of January 31, 2015, and into the early morning hours of February 1, 2015. Mr. Beck ended his shift at Arby's restaurant between 8:00 p.m. and 9:00 p.m. and then drove in his green Ford Windstar van to the Night Deposit. After he parked his van, Ernest Poe asked Mr. Beck if he could borrow the green Ford van. Mr. Beck agreed, giving Mr. Poe the van keys before going inside the Night Deposit. Mr. Beck identified himself on surveillance video footage from the Night Deposit. On the surveillance footage, at around 3:00 or 4:00 a.m., Mr. Poe returned Mr. Beck's keys to him. Mr. Beck recalled that Mr. Poe had offered him $100.00 for the use of his van. When Mr. Beck entered his van to leave, he noticed the van had the strong odor of gasoline and a gasoline can that had not been in his van before he lent it to Mr. Poe.

Ernest Poe,[3] a friend of Defendant Williams, sold drugs, "Molly," with Defendant Williams. He explained that Defendant Williams supplied the drugs to Mr. Poe, and Mr. Poe sold the drugs. Mr. Poe also sold drugs for Defendant Forman. Mr. Poe described "Molly" as "ecstasy on steroids" and "a club drug." Mr. Poe knew the victim through Defendant Forman and Defendant Williams.

After Defendant Forman and the victim's January 26 arrest, Defendant Williams approached Mr. Poe at the Night Deposit and asked Mr. Poe for money to post bond for Defendant Forman. Several nights later, Mr. Poe saw Defendant Forman at the Night Deposit. Defendant Forman told Mr. Poe that he believed that the victim had "told on him."

On the night of January 31, 2015, Mr. Poe asked Mr. Beck to borrow his green Ford van on Defendant Williams's behalf. Mr. Poe explained that Defendant Williams owned a painting business and needed the green Ford van for a job he had that night painting an apartment. Defendant Williams offered money in exchange for use of Mr. Beck's green Ford van. When delivering the green Ford van keys to Defendant Williams, he saw both defendants in Defendant Williams's Pontiac sedan. Mr. Poe remained at the Night Deposit until around 4:30 on the morning of February 1, 2015. He left the Night Deposit with Mr. Beck. When he entered the green Ford van he noticed the smell of gasoline in the van and saw a gas can in the back of the van.

Mr. Poe admitted that he was not initially fully transparent when speaking with the police on two separate occasions in February. In June, after his March arrest related to this

---

[3] Mr. Poe was also charged with accessory to murder after-the-fact in connection with the victim's murder. At the time of trial, he had not pleaded guilty or negotiated a "deal" with the State.

case, he gave a statement more consistent with his trial testimony. In the June statement, he recalled that Defendant Forman "said he was going to have [Ms. Murphy] kick [the victim]'s a\*\* because she talked too much." According to Mr. Poe, Defendant Forman believed that the victim had provided the police with Defendant Williams's and Ms. Murphy's names. In this statement to the police, he also revealed that, on Friday night, January 30, 2015, Defendant Forman had told him that "something bad happened at his apartment." The following night Defendant Williams had arranged with Mr. Poe to borrow the green Ford van. Mr. Poe estimated that the defendants arrived at the Night Deposit at around 1:00 a.m. to borrow Mr. Beck's van and returned at around 4:00 a.m.

TBI Special Agent Randall Nelson, an expert in the field of microanalysis, tested liquid collected from a gas can found inside a green Ford van. The testing revealed the presence of a gasoline range product. Special Agent Nelson described gasoline as "highly flammable." Special Agent Nelson also tested the soil collected from between the victim's legs, under the victim's body, and around the victim's head, which revealed the presence of an evaporated gasoline range product. He was unable to positively identify the presence of a gasoline product from the soil collected from beneath the victim's torso due to the deteriorated condition of the sample.

Law enforcement collected swabs from the gas can recovered from the back-passenger seat of the green Ford van. DNA analysis of those swabs showed the presence of a DNA profile consistent with a mixture of at least three individuals. The minor contributor profile was too degraded for interpretation; however, the major contributor DNA profile matched Defendant Williams's DNA profile. Law enforcement found several areas inside the van that screened positive for the presence of blood. A sample collected from the lower part of the van's sliding door provided a partial DNA profile that matched the victim's DNA profile.

The State presented evidence, through Ashford Place Apartment property manager Alicia Foster, that Defendant Forman moved into the Ashford Place apartment, a second-floor unit, on December 19, 2014, and moved out of the apartment on February 16, 2015. The State also presented evidence of the victim's January 31 police report about the burglary to her home and the January 26 vehicle stop and subsequent arrests of Defendant Forman and the victim.

As part of the investigation, officers collected gas cans and green ratchet straps from Allenwood Drive. Investigator Scarbro identified a ZTE cell phone that was recovered from an area of Needmore Road that Ms. Murphy had indicated was the location where she and Ms. Williams disposed of the victim's phone.

Law enforcement executed a February 4, 2015 search of the Ashford Place apartment. Officers seized Defendant Forman's phone, a Samsung Verizon black flip phone. The phone was the same make and model as the cell phone the defendants' purchased at Walmart on the night of the victim's murder. The State played for the jury a video of the execution of the search warrant. TBI agents also collected for DNA testing a zip-up hoodie and a gray jacket from a hamper located in a closet near the front door of the apartment. The items were collected because Special Agent Kendall Stoner observed a small stain on the hoodie consistent with the appearance of a blood stain and a reddish-brown stain on the "jacket strings" used to adjust the hood of the gray jacket. Special Agent Stoner also collected a pair of boxer briefs and white high-top tennis shoes from the closet of the second bedroom.

Special Agent Stoner conducted DNA testing on all three of the items collected. On the zip-up hoodie, the DNA profile from a stain matched the victim's DNA profile. Preliminary testing of the reddish-brown stain on the "jacket strings" indicated the possible presence of blood. Additional DNA analysis matched Defendant Forman's DNA profile.

A second search warrant was executed on February 19, 2015, with a specific focus on the kitchen. During execution of the second search warrant, Special Agent Stoner collected a sample of a reddish-brown stain from the wall near the pantry in the kitchen, a portion of the kitchen floor, wood trim from inside the kitchen and a piece of a metal transition located between the kitchen and the hallway. DNA analysis was inconclusive as to the floor sample but the sample taken from the wall provided a partial DNA profile that matched the victim's DNA profile. The metal transition indicated a partial DNA profile that matched the victim's DNA profile. The victim's DNA was also found on a ratchet collected at the crime scene.

David Zimmerman testified as an expert in forensic pathology and performed the autopsy of the victim. He found thermal burns and charring of the entire body surface area and that some of the bones of the skull, torso, arms, hands, and legs were charred. Additionally, there were "heat-related fractures" to some of the victim's bones. Dr. Zimmerman was unable to identify any external genitalia due to the severity of the burns to the body. Dr. Zimmerman found melted plastic on the victim's head and legs. Dr. Zimmerman identified a photograph showing ribs and vertebrae that had "calcination." He explained that calcination occurred when a bone was heated between 1,000- and 2,000-degrees Fahrenheit. The only evidence of trauma that was not fire-related was bleeding found in the muscle on the left side of the victim's head. Dr. Zimmerman opined that "pretty good force" would have caused an injury of that nature and that such an injury could render a person unconscious.

Dr. Zimmerman testified that the cause of death was thermal burns, smoke inhalation, and blunt trauma, and the manner of death was homicide. He identified the circumstances of death as "[w]rapped in a tarp and burned." Dr. Zimmerman submitted skeletal muscle tissue for toxicology testing, and the results indicated that the carbon monoxide level was 33%. This percentage indicated to him that the victim was breathing in carbon monoxide. In determining cause of death, Dr. Zimmerman found no indication of stab wounds, gunshot wounds, or strangulation. Dr. Zimmerman stated that, in his medical opinion, the victim was inhaling, thus alive, at the time that she was being burned.

On cross-examination by Defendant Forman's attorney, Dr. Zimmerman testified that an injury consistent with the injury he found on the victim's head would cause the loss of twenty to thirty milliliters of blood. Due to the burned condition of the victim's body, Dr. Zimmerman could not determine if she sustained any additional cuts or abrasions.

Edward Barbieri, employed at National Medical Services ("NMS") Labs in Willow Grove, Pennsylvania, testified that he had three titles at the lab: forensic toxicologist, assistant laboratory director; and toxicology technical leader. Dr. Barbieri testified as an expert witness in the field of forensic toxicology. He explained to the jury the difference between carbon dioxide, which is produced in our body and exhaled, and carbon monoxide, which is a toxic compound that we inhale from the environment. NMS Labs analyzed approximately 200 tissue samples every year looking for the presence of carbon monoxide.

Dr. Barbieri testified that the average person who does not smoke has one to four percent of a carbon monoxide compound in their body. A person who smokes may have up to eight or ten percent of the compound in their body. NMS Labs tested the victim's tissue samples and found a 33% saturation of the hemoglobin. Dr. Barbieri stated that if the victim had not been breathing while exposed to smoke from a fire, she would not have had that level of saturation. He reiterated that there was no other way for carbon monoxide to enter a body other than inhalation. Dr. Barbieri explained that the saturation estimate NMS Labs reported would likely be lower than the actual level due to the volatility of carbon monoxide; thus, the level reported is the minimum concentration.

The State concluded its case-in-chief against the defendants and, as relevant to this appeal, Defendant Forman made a motion for judgment of acquittal as to all of the charges against him. The trial court denied the motion, and Defendant Williams presented the following evidence: Defendant Williams testified that he first met the victim in October 2014. He described the victim as an "emotional support system" for him during a difficult time in his marriage. Defendant Williams felt that he could "vent" to the victim, and he saw the victim as someone who cared about him. He agreed that he was having an extramarital affair with the victim and that he and the victim also sold drugs together. He further agreed that he and the victim used drugs together.

- 15 -

Defendant Williams testified about events surrounding Defendant Forman and the victim's January 26 arrest. Following his arrest, Defendant Forman posted bond and was released from jail before the victim. When Defendant Forman arrived at the Ashford Place apartment he was upset about the arrest because "drugs mysteriously popped up in his vehicle" and he "lost" his truck in the resulting arrest. Defendant Williams believed that the victim planted the drugs in Defendant Forman's vehicle. He explained that he had spent the night before the arrest at the victim's house. The following morning, he asked permission to leave the drugs, which were contained in a Mason jar, at her residence. The victim agreed. According to Defendant Williams, the drugs he left at the victim's residence were the same drugs the police found in Defendant Forman's vehicle on January 26, 2015. Defendant Williams agreed that he sold illegal drugs and confirmed that he dealt drugs with Mr. Poe at the Night Deposit.

Defendant Williams acknowledged hostility between the victim and Ms. Williams. He suspected that Defendant Forman had told Ms. Williams about Defendant Williams's affair with the victim. This disclosure led to a fight between the victim and Ms. Williams in the Ashford Apartments parking lot.

Defendant Williams testified that, on January 31, 2015, Ms. Williams drove the defendants to Walmart to purchase the locks. When they returned to the apartment, he asked Ms. Williams to go to the store and buy him a Gatorade. Shortly after Ms. Williams left, Ms. Murphy attempted to enter the apartment with her old key but could not due ot the new door lock. Defendant Williams maintained that he and the victim were on good terms; however, he did not understand how or why police found his drugs in Defendant Forman's truck so he changed the door lock to the apartment. Defendant Williams called Ms. Williams and instructed her not to return because the victim and Ms. Murphy were there. Defendant Williams opened the door, and Ms. Murphy breezed past him. When the victim entered, she asked who had kicked in the door to her home. Defendant Williams knew about the break-in but denied to the victim any knowledge of the incident. Defendant Williams explained to the jury that Ms. Williams had driven him and Defendant Forman to the victim's house. Defendant Williams knew the victim was not home because her van was not parked in the driveway. According to Defendant Williams, "they" had broken into the victim's house to find information about why drugs were in Defendant Forman's vehicle.

Defendant Williams denied that he was upset with the victim when she arrived at the Ashford Place apartment. He recalled trying to calm the victim, who was upset about someone kicking in her door and stealing her pills, when Ms. Williams entered and the two women immediately began physically fighting. Initially, Defendant Williams chose not to intercede because he believed the victim could "handle herself" and that it was a "fair

fight"; however, once he believed both women to be at the point of exhaustion, he interceded. As he separated them, the victim was bent over trying to swing at Ms. Williams and fell on the floor. The victim began taunting Ms. Williams about the victim's sexual interactions with Defendant Williams. In response, Ms. Williams picked up a hammer and slammed it down on the counter. Defendant Williams stood by the threshold of the kitchen as the three of them argued about his relationship with the victim. Defendant Forman stood in the corner of the kitchen and began asking the victim questions about the January 26 arrest.

The victim called out for Ms. Murphy, who had been in the bedroom packing her belongings. When Ms. Murphy appeared, Ms. Williams became argumentative with Ms. Murphy, so Defendant Williams ushered Ms. Murphy back to the bedroom where they both remained. In the kitchen, Defendant Forman continued to question the victim about the events surrounding their January 26 arrest. At that point, Ms. Williams struck the victim again. Defendant Williams watched from the bedroom as the two women resumed fighting. When he saw the victim "pretty much like in submission," he went out and said, "What are you doing?" Ms. Williams responded, "This is because of you. You want to f**k this b**ch." He returned to the bedroom and urged Ms. Murphy to quickly finish packing so that they could leave. Defendant Williams looked out the bedroom door and saw Ms. Williams standing over the victim and Defendant Forman wearing gloves. It struck Defendant Williams as odd that Defendant Forman had put on gloves in the apartment. He continued to urge Ms. Murphy to hurry. He said that he planned to rent a hotel room where he and Ms. Murphy could stay to avoid the fighting. He explained that Ms. Williams and the victim had been texting one another and posting threats on Facebook, so he believed this interaction between them was inevitable.

According to Defendant Williams, Ms. Williams entered the back bedroom and ordered him to leave so she could strip search Ms. Murphy to ensure Ms. Murphy was not wearing a wire. Defendant Williams walked down the hallway and saw Defendant Forman standing in the kitchen and the victim crying and saying, "I didn't set you up." He felt he had no part in the conversation so he went to another room to allow Defendant Forman and the victim to talk. Ms. Williams exited the bedroom and went to the kitchen. When she left the bedroom, Defendant Williams returned to the bedroom to find Ms. Murphy hysterical. Defendant Williams sat next to Ms. Murphy and tried to calm her. About this time, he heard a gasp. He then tiptoed to the kitchen and saw Ms. Williams and Defendant Forman in the kitchen with the victim who was on the floor in the corner of the kitchen. He watched as Defendant Forman, who was standing over the victim, reached down toward the victim. When his hand came up, Defendant Williams saw a belt on Defendant Forman's hand. Initially, he wondered why Defendant Forman had a belt, but then he realized why the victim was silent. He opined that the victim was silent because Defendant Forman had strangled her with the belt. He testified as follows:

So then I heard the thud. That's what she was talking about [in her testimony]. The thud. That was [the victim's] head hitting the floor. She's probably unconscious. But that wasn't good enough. So he took his hands - - left the belt around her neck. Took his hands, grabbed her by her hair, and just kept hitting her head on the floor over and over and over and over and over and over.

Defendant Williams described Ms. Williams as "in a rage" as she stood by with her arms crossed and watched. When Defendant Forman finished, Ms. Williams walked over to where the victim was lying and said, "Yeah, b**ch, you won't f**k my husband no more." Ms. Williams "pulled out" an X-Acto knife and slit the victim's throat.

After witnessing these events, Defendant Williams fled to the bedroom and told Ms. Murphy, "We got to go now." Before they could leave, Defendant Forman and Ms. Williams blocked the doorway, preventing their exit. Defendant Forman told Defendant Williams that no one would be leaving. Defendant Forman instructed Ms. Murphy to move the victim's van with Ms. Williams, and both women quickly left. Defendant Williams confirmed that the victim's feet were in a garbage bag and that her hands and ankles were zip-tied "POW style." Defendant Williams explained that, after witnessing Ms. Williams and Defendant Forman's acts against the victim, he was scared. He agreed that he helped dispose of the body and clean the apartment, but he explained that he feared that if he did not, Defendant Forman and Ms. Williams would kill him too.

Defendant Williams denied that he hit the victim at any time. He said the victim was "a great experience in my life." Defendant Williams estimated that, after the victim was killed, he stayed in the bedroom for about two hours trying to figure out how to dispose of the body. Ultimately Defendant Forman devised a plan to dispose of the body. Defendant Williams drove his Avalon with Defendant Forman as a passenger to Walmart to buy ratchet straps and tarps. After this purchase, he drove to Allenwood Drive before returning to the Ashford Place apartment at around midnight.

Defendant Williams testified that the defendants took cleaning supplies to the apartment such as "Mean Green" and "non germicidal bleach." Defendant Williams parked Ms. Williams's van in a less conspicuous parking lot in the complex and the two men went upstairs to wrap the body in a tarp for removal. Defendant Williams checked the victim for a pulse and found none. He described a large amount of blood surrounding the victim's body, and he opined that the victim had bled out during the many hours her body was left in the apartment. After placing the victim on a tarp, Defendant Williams helped Defendant Forman wrap the victim's body in a blanket. When Defendant Williams

rolled the victim over onto the blanket, he saw her throat was "sliced." He said that the victim's head was "flopping . . . like it was about to come off." After wrapping a blanket around the victim's body, Defendant Forman wrapped duct tape around the blanket to secure it while Defendant Williams held the victim's body off the ground. The victim was wrapped in a blanket and lying on the tarp when the men determined they needed to find a vehicle to transport the victim.

Defendant Williams and Defendant Forman drove to the Night Deposit and spoke with Mr. Poe about the possibility of borrowing a van. Defendant Williams offered $100 for use of a vehicle, and Mr. Poe arranged for the defendants to borrow Mr. Beck's green Ford van. The defendants drove the green Ford van to Walmart for more supplies. During this trip, they bought a mop, gloves, a gas can, and a respirator mask. They also purchased gas at a Kangaroo Mart. While at the Kangaroo Mart, Defendant Forman filled the gas can purchased at Walmart and placed it in the green Ford van. When they returned to the apartment, they wrapped the victim in the tarp and used the ratchet straps to secure it. The defendants parked the green Ford van by the curb near the apartment. They moved the victim from the Ashford Place apartment into the van, sliding the victim's body onto the bench seat.

Defendant Williams identified areas where he removed light bulbs outside of the Ashford Place apartment to conceal their activity. He also explained why the TBI found blood on the bottom panel of the green Ford van. He recalled that, after placing the victim in the van, her head was hanging off of the bench seat preventing the van door from easily sliding shut. After unsuccessfully attempting to pull the victim's body further into the van, Defendant Williams forcefully shut the van door, causing the door to brush up against the victim's head. After getting the van door closed, Defendant Forman drove the green Ford van to a field. Defendant Williams recalled that he also had trouble opening the van door because "her head [was] down there by the doorjamb where that blood was at." Defendant Forman forcefully opened the door from the outside and the victim "slid out."

Once the victim was laid on the ground, Defendant Williams cut the tarp open and Defendant Forman poured gasoline over the victim's body. Defendant Williams explained that he cut open the tarp because he did not believe the tarp would burn sufficiently. Defendant Williams stated that the victim was not breathing before Defendant Forman set the body on fire.

Defendant Williams testified that he gave Ms. Williams his boots and Defendant Forman's boots in a black trash bag at 5:30 a.m. Defendant Williams admitted that, when the police first interviewed him, he was not truthful. He later fled the jurisdiction, using a false name to purchase a bus ticket to Virginia, where he was ultimately arrested. After his arrest, he sent several letters to Agent Scarbro. The information he provided in those letters

was not what he had testified to at trial. He explained that he provided "bits and pieces" in the letters to Agent Scarbro because he did not want "to show [his] hand." He said that he was testifying to give closure to the victim's family.

On cross-examination by the State, Defendant Williams agreed that during the first trip to Walmart, he and Defendant Forman bought a large container, two brown tarps, two rolls of duct tape, two red ratchet straps, two bottles of "Mean Green" cleaner, a phone card, two pairs of rubber gloves, and a large box of Gorilla trash bags, and two respirators. On the second trip to Walmart, the defendants purchased two flashlights, a Samsung phone, a pack of sponges, a mop, and a gas can. Receipts reflecting these purchases were entered into evidence. Defendant Williams agreed that it was his intention to destroy any evidence of the victim's murder. He further agreed that it was his decision to cut open the tarp so that the victim's body would burn. Defendant Williams confirmed that he was engaged in a sexual relationship with Ms. Murphy during the same period of time he engaged in a sexual relationship with the victim.

Defendant Williams testified that during a February 4, 2015 police interview, he identified himself and Defendant Forman in still photographs taken from the Walmart surveillance video footage. During the interview, he lied to Agent Scarbro, saying that he bought the cleaning supplies at Walmart for his cleaning business. Defendant Williams admitted that he also lied to Investigator Scarbro during a February 6, 2015 meeting at the Springfield District Attorney's Office. During this meeting, he told Investigator Scarbro that, after going to Walmart, he went to a residence on Shelton Circle to paint and clean-up. When confronted with the date on the invoice for the Shelton Circle job, Defendant Williams spoke with his attorney and then changed his account of the night's events. He then claimed that he drove Defendant Forman to Walmart and dropped him off at the Ashford Place apartment. He denied going inside the Ashford Place apartment. Defendant Williams admitted this also was a lie. During the interview, Defendant Williams also lied to Investigator Scarbro about the color of the ratchet straps and tarps he had purchased. Defendant Williams gave a third statement on March 24, 2015. Defendant Williams agreed that he told law enforcement lies in this statement as well.

Defendant Williams identified his Facebook account name, "Profitable New York." The State asked Defendant Williams about several responses on his FB page to questions posted to him about Ms. Williams's arrest for the murder. The user "Profitable New York" responded "we didn't do it" to two separate queries. He confirmed that the "we" referred to him and Ms. Williams. Defendant Williams confirmed that he knew Keisha Lynch. Ms. Lynch posted on Defendant Williams's Facebook page, "So my aunt had nothing to do with it? That's all I care about. I don't care about anything else." "Profitable New York" responded "Oh, that's nice, but she didn't kill nobody; wrong place, wrong time."

Although contrary to his trial testimony, Defendant Williams agreed that he had posted this response indicating that Ms. Williams had not killed the victim.

Defendant Forman presented no proof.

After hearing this evidence, the jury convicted the defendants as charged. The jury imposed a life sentence without the possibility of parole for the murder convictions, and the trial court merged the premeditated murder convictions into the felony murder convictions. At a subsequent sentencing hearing, the trial court imposed twenty-five-year sentences for the especially aggravated kidnapping convictions and then ordered consecutive sentencing for a total effective sentence for each Defendant of life plus twenty-five years. It is from these judgments that the defendants now appeal.

## II. Analysis
## A. Sufficiency of the Evidence

On appeal, the defendants challenge the sufficiency of the evidence. Defendant Williams and Defendant Forman both argue that the State did not prove premeditation to support their convictions for first degree premeditated murder. Further, they assert that there was insufficient evidence that the victim was alive at the time she was wrapped in the tarp and transported to the field, thus, the State failed to prove that they committed especially aggravated kidnapping. They contend that, without sufficient evidence of especially aggravated kidnapping, there is no basis for their convictions for first degree murder in perpetration of felony kidnapping. The State responds that there was sufficient evidence for a rational jury to find the defendants guilty beyond a reasonable doubt of first degree premeditated murder, first degree felony murder, and especially aggravated kidnapping. We agree with the State.

Additionally, Defendant Forman argues that the trial court erred by denying his motion for judgment of acquittal at the end of the State's proof because the State failed to establish the elements of kidnapping. "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). Because the standard of review is the same for a challenge to a denial of a motion for judgment of acquittal and a challenge to the sufficiency of the evidence, we will address Defendant Forman's claim in this section.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a

defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

### 1. First Degree Premeditated Murder

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2018). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2018). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2018).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence, viewed in the light most favorable to the State, showed that the defendants were angry with the victim for her role in Defendant Forman's January 26 arrest. The defendants changed the locks on the Ashford Place apartment door and broke into the victim's residence in retaliation, demonstrating their hostility toward the victim. On January 31, 2015, when the victim arrived at the Ashford Place apartment to confront the defendants about their role in the break-in of her home, an argument and physical fight ensued. As a result, the victim was left naked, bleeding, with her hands and feet bound, lying on the kitchen floor while the defendants, Ms. Williams, and Ms. Murphy gathered in a bedroom to discuss their next steps. The foursome agreed that Ms. Williams and Ms. Murphy would return the victim's van to her residence to avoid any indication of the victim's presence at the apartment. Meanwhile, the defendants bought supplies to dispose of the victim's body and arranged for the use of a van to transport the body to a remote

location.  Upon returning to the apartment, Defendant Williams, unscrewed several light bulbs located outside the apartment to obscure any potential onlookers' view of the two men entering and exiting the apartment as they prepared to move the victim.  After the defendants wrapped the victim in a blanket, restraining the victim with duct tape around the blanket, they wrapped the body in a tarp and secured it with ratchet straps.  The defendants transported the victim to a field, cut through the tarp, and poured gasoline directly onto the blanket wrapped around her body.  They then ignited the blanket and left the victim to burn in the field.  They returned to the apartment, cleaned up any signs of the altercation, and went to Allenwood Drive.  At Allenwood Drive, Defendant Williams instructed Ms. Williams and Ms. Murphy to dispose of the defendants' shoes and wrote a note to Ms. Williams that they had "burned her."  This is sufficient evidence upon which a rational jury could conclude that the defendants intentionally killed the victim with premeditation.

The State presented evidence of the particular cruelty of the killing and testimony about the defendants' calmness immediately after the killing, factors which support the jury's finding of premeditation.  *See, Bland*, 958 S.W.2d at 660.  Additionally, the Defendant testified at length about the defendants' destruction and secretion of evidence of the murder.  *See*, *Nichols*, 24 S.W.3d at 302.  Finally, the State presented evidence of a motive for the murder.  *See Leach*, 148 S.W.3d at 54.  Each of these factors is relevant to premeditation.  *See State v. Pike*, 978 S.W.2d 904, 914-15; *Bland*, 958 S.W.2d at 660.  Accordingly, we conclude that there was proof upon which a jury could conclude, beyond a reasonable doubt, that the defendants intentionally killed the victim with premeditation.  The defendants are not entitled to relief as to this issue.

## 2. Especially Aggravated Kidnapping

Tennessee Code Annotated section 39-13-305(a) defines the offense of especially aggravated kidnapping as follows:

(a) Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302:

(1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; [or]
(2) Where the victim was under the age of thirteen (13) at the time of the removal or confinement; [or]
(3) Committed to hold the victim for ransom or reward, or as a shield or hostage; or
(4) Where the victim suffers serious bodily injury.

- 24 -

(b)(1) Especially aggravated kidnapping is a Class A felony.

"A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302 (2018).

The evidence, viewed in the light most favorable to the State, proved that following a physical assault on the victim that subdued her, the defendants zip-tied the victim's hands and feet to restrain her. The medical examiner testified to evidence of blunt force trauma to the side of the victim's head that could have rendered the victim unconscious but would not have been lethal. Ms. Williams and Ms. Murphy testified that the victim was bleeding, still, and silent while lying on the kitchen floor. The defendants left the bleeding victim, with her hands and feet zip-tied, lying on the kitchen floor while, over the course of hours, the defendants went to Wal-Mart twice, Allenwood Drive, the Night Deposit, and a gas station. These restraints prevented the victim from leaving the apartment while the defendants were gone. The restraints also prevented her from struggling or fighting back as the defendants transported her to the field. This is sufficient evidence that, with the use of zip-ties and ratchet straps, the defendants confined the victim to the kitchen thereby substantially interfering with her ability to move, leave the apartment, or struggle against the defendants as they transported her to the field.

The defendants argue that the victim was not alive at the time that they set her body on fire and that she died much earlier at the apartment, precluding a finding of especially aggravated kidnapping. Defendant Williams readily admitted at trial to his role in igniting the victim on fire but asserted that the victim was already deceased, and he was only disposing of the evidence. Two medical examiners, however, testified at trial that the toxicology report indicated a high level of carbon monoxide in the victim's muscle tissue. Both doctors stated that the level contained in the victim's muscle tissue could only be reached by inhalation of the smoke, supporting the State's theory that the victim was alive at the time the defendants set her on fire in the field.

At trial, Defendant Williams opined that the victim bled out in the kitchen and was deceased long before she was transported in the van to the field. To the contrary, Dr. Zimmerman testified to evidence of blunt force trauma on the victim's head. Dr. Zimmerman opined that "pretty good force" would have caused an injury of that nature and that such an injury could render a person unconscious but would not have caused excessive bleeding. Likewise, Ms. Williams testified that she did not see a large amount of bleeding.

The jury heard the testimony of both medical examiners about the carbon monoxide levels. The jury also heard Defendant Williams's, Ms. Williams's, and Ms. Murphy's testimony that they believed the victim to be dead at the apartment. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). By its verdict the jury accepted the State's medical testimony which provided sufficient evidence to support that the victim was alive at the time she was set on fire and, thus, alive while restrained in the apartment and during transport.

Accordingly, we conclude that there was sufficient evidence to support the jury's finding, beyond a reasonable doubt, that the defendants in the course of restraining the victim caused the victim serious bodily injury through blunt force trauma to the victim's head. The defendants are not entitled to relief as to this issue.

## 3. First Degree Felony Murder

Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, *kidnapping*, aggravated child abuse or aircraft piracy. . . ." T.C.A. § 39-13-202(a)(2) (emphasis added). In this case, the defendants were charged with felony murder during the perpetration of kidnapping.

The defendants' challenge is premised upon our finding that there is insufficient evidence that they kidnapped the victim. Because we found to the contrary, that the State presented evidence to support the jury's finding, beyond a reasonable doubt, that the defendants restrained the victim and caused serious bodily injury through blunt force, we also conclude that there was sufficient evidence to support first degree felony murder.

The defendants contend that the proof at trial showed that the victim died in the apartment, therefore, she was not removed or confined as required by statute. The medical testimony presented at trial was that the victim was breathing at the time she was ignited on fire in the field, as evidenced by the lethal level of carbon monoxide in her muscle tissue. It is not the role of this court to re-weigh the evidence. The State presented sufficient evidence upon which a jury could conclude that the defendants restrained the victim and moved her from the apartment to the field where she died during the perpetration of the kidnapping. The defendants are not entitled to relief as to this issue.

## 4. Rule 29 Motion for First Degree Felony Murder

- 26 -

Defendant Forman asserts that the trial court erred when it denied his motion for judgment of acquittal for the charge of first degree felony murder because the State failed to prove the elements of kidnapping. As mentioned previously, our review of this issue is the same as our review of the issue of whether the evidence is sufficient to sustain the Defendant's convictions. *See State v. Price*, 46 S.W.3d 785, 818 (Tenn. Crim. App. 2000). As we previously concluded, the evidence presented at trial was sufficient to support Defendant Forman's conviction for first degree felony murder and especially aggravated kidnapping. He is, therefore, not entitled to relief on this issue.

## B. Motion to Sever

Defendant Forman filed a pretrial motion to sever. In support of his request for severance, he argued that the State's case might include testimony or a statement by a codefendant in violation of *Bruton v. United States*, 391 W.S. 123 (1968). He further argued that the complexity of the case might prevent the jury from making a reliable judgment. At the hearing on pretrial motions, the following exchanged occurred about Defendant Forman's motion to sever:

[State]: Motion for severance of the Defendants, I believe the basis is statements given by the Defendant to law enforcement, that either reference the other co-defendant or implicates the other co-defendant. The State will not be using statements given to law enforcement. I think that nullifies the basis for severance as expressed in these motions?

[Trial Court]: I would agree with that. Does that resolve your issue?

[Defense Counsel]: Yes, Your Honor.

Despite Defense Counsel's acquiescence to the State's resolution, Defendant Forman unsuccessfully raised the same issue in his motion for new trial. On appeal, Defendant Forman maintains that the trial court should have granted the severance motion; however, he now argues that the motion should have been granted to preclude the jury from hearing Defendant Williams's trial testimony. The State correctly notes that our review is limited to issues that are properly preserved for review in the trial court, contained in a motion for a new trial, and properly presented for review in this Court. *State v. Adkisson*, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994). On appeal, Defendant Forman has changed his legal theory, thereby precluding the trial court from addressing the issue of

which he now complains. By so doing, he has failed to properly preserve his issue and waived review of the issue. *Id.*

To the extent Defendant Forman intended to maintain his claim of a *Bruton* violation, a review of the record reveals no violation of the Confrontation Clause pursuant to *Bruton v. United States*, 391 W.S. 123 (1968). *Bruton* applies in cases where the State seeks to admit an inculpatory out-of-court statement made by a non-testifying codefendant. Introduction of an out-of-court inculpatory statement denies a defendant the opportunity to cross-examine the codefendant about the statement and, therefore, violates the Confrontation Clause. Here, however, Defendant Williams testified at trial and Defendant Forman had the opportunity to cross-examine Defendant Williams. Thus, we conclude there was no *Bruton* violation. Defendant Forman is not entitled to relief as to this issue.

### C. Motion to Suppress

Defendant Forman asserts that the trial court erred when it denied his motion to suppress evidence found during searches of the Ashford Place apartment. He contends that the search warrants lacked the required particularity and failed to specifically set forth the items to be seized. The State responds that the warrant clearly identified the things authorized to be seized and, therefore, was sufficiently particular. We agree with the State.

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Additionally, the prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id*. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id*. Despite the deference to the trial court for factual issues, this Court reviews the trial court's application of the law to the facts *de novo*, without any deference to the trial court's determinations. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001).

The Fourth Amendment to the United States Constitution requires a search warrant to contain a particular description of the items to be seized. *See State v. Henning*, 975 S.W.2d 290, 296 (Tenn. 1998); *see also* U.S. Const. amend. IV. Furthermore, Article I, § 7 of the Tennessee Constitution prohibits general warrants, and Tennessee Code Annotated § 40-6-103 requires search warrants to describe particularly the place and property to be searched. *State v. Bostic*, 898 S.W.2d 242, 245 (Tenn. Crim. App. 1994); *see also* Tenn. Const. art. I, § 7; T.C.A. § 40-6-103. To satisfy the particular description requirement, a warrant "'must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized.'" *State v. Meeks*, 867 S.W.2d 361, 372 (Tenn. Crim. App.

1993) (quoting *United States v. Cook*, 657 F.2d 730, 733 (5th Cir.1981)); *see also Henning*, 975 S.W.2d at 296. "Where the purpose of the search is to find specific property, [the property] should be so particularly described as to preclude the possibility of seizing any other [property]. . . . [I]f the purpose [of the warrant is to seize] . . . any property of a specified character which, by reason of its character, and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description, save as to such character, place and circumstances, would be unnecessary, and ordinarily impossible." *Lea v. State*, 181 Tenn. 378, 181 S.W.2d 351, 352-53 (Tenn.1944); *see also Henning*, 975 S.W.2d at 296.

The prohibition against a general warrant was intended to limit governmental intrusion upon a citizen's privacy and property rights to that shown to the magistrate to be necessary to pursue a legitimate government interest. The particular description requirement is meant to leave little discretion to the officer conducting the search in order to prevent general searches and to prevent the seizure of items upon the mistaken assumption that they fall within the warrant's authorization. *See* 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE, § 4.6(a) (2d ed. 1987). "A general order to explore and rummage through a person's belongings is not permitted. The warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. 1981).

The warrant in this case instructed officers to seize, "[h]uman hair, human tissue, human bone fragments, human teeth, human blood, [and] latent fingerprints." Noting that there was no requirement that officers determine the source of the blood before testing the blood, the trial court found that the warrant was not an unlawful general warrant.

We agree with the trial court that the search warrant in this case sufficiently particularized the items to be seized. The search warrant was issued in order to seize items related to the victim's kidnapping and death, some portion of which officers believed to have occurred in Defendant Forman's apartment. The warrant authorized officers to seize a long list of items identified through the course of the investigation and items associated with an assault and kidnapping. The warrant does not identify whose blood the officers would be seizing as the DNA of any blood sample found and obtained would be unknown until after the DNA testing; the purpose for which the officers were taking the samples. The absence of a more particularized description does not make the warrant a general warrant. We conclude the warrant in this case enabled the executing officers "to reasonably ascertain and identify the things which are authorized to be seized." *See Meeks*, 867 S.W.2d at 372. As such, the Defendant is not entitled to relief on this issue.

It appears that for the first time on appeal, Defendant Forman may also intend to challenge the particularity of the warrant language, "any other item that could be used to

inflict blunt force trauma or sharp force injuries." As earlier discussed, our review is limited to issues that are properly preserved for review in the trial court, contained in a motion for a new trial, and properly presented for review in this Court. *State v. Adkisson,* 899 S.W,2d 626, 634-35 (Tenn. Crim. App. 1994). Defendant Forman's failure to challenge this language at the trial court precludes our review.

## D. Admission of 404(b) Evidence

Defendant Forman asserts that the trial court improperly denied his motion to exclude evidence of his arrest with the victim pursuant to Tennessee Rule of Evidence 404(b). The State responds that the trial court properly exercised its discretion when it allowed evidence of the previous arrest as highly probative proof of Defendant Forman's motive and intent. We agree with the State.

Relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 402, 403. Rule of Evidence 404 prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). The trial court may admit the evidence for non-character purposes if four conditions are met:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). If a trial court "substantially complies" with these requirements, this court will review for an abuse of discretion. *State v. McCary*, 119 S.W.3d 226, 244 (Tenn. Crim. App. 2003) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). If the evidence sought to be admitted is relevant to an issue other than the accused's character, such as identity, motive, common scheme, intent, or rebuttal of accident or mistake, it may be admitted for that purpose so long as the danger of unfair prejudice does not outweigh the probative value. Tenn. R. Evid. 404(b), *Advisory Comm'n Cmts.*; *McCary*, 119 S.W.3d at 243.

At the pre-trial hearing on the motion to exclude evidence of the January 26, 2015 arrest, the trial court found that motive and intent were both going to be at issue in the trial. The trial court found that proof of the arrest was clear and convincing and reasoned that the arrest was part of a chain of logical inferences that supported the underlying contextual background for the case. This chain of logical inferences demonstrated a motive for the kidnapping and murder of the victim. The trial court also found that the probative value of the arrest was not outweighed by the danger of unfair prejudice.

We cannot conclude that the trial court abused its discretion in admitting the evidence of Defendant Forman's January 26 arrest for purposes of showing Defendant Forman's motive and intent in committing such a cruel and brutal crime. We note that the January 26 arrest was an arrest for possession of drugs, and the arrest was not for a crime associated with violence against a person. Defendant Forman is correct that evidence of an arrest is prejudicial; however, although this evidence may have implied that Defendant Forman engaged in criminal behavior, the State did not introduce it for this purpose. It was introduced to help the jury understand the evidence and the motive behind the events that followed. This relevant evidence, therefore, in our opinion does not constitute propensity evidence, so as to be precluded by Tennessee Rule of Evidence 404(b). Defendant Forman is not entitled to relief as to this issue.

### E. Sentencing

Defendant Williams argues that the trial court erred when it sentenced him. He asserts that his twenty-five-year sentence for especially aggravated kidnapping is excessive. He also contends that consecutive sentencing is improper in this case. The State responds that the trial court did not abuse its discretion by imposing a within-range sentence or by ordering consecutive sentencing. The State asserts that Defendant Williams's sentence is also consistent with the purposes and principles of the Sentencing Act and, therefore, should be affirmed. We agree with the State.

On appeal, a defendant bears the burden of establishing that his sentence is improper. T.C.A. § 40-35-401 (2019), *Sentencing Comm'n Cmts*; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). Appellate review of sentences is under the abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The jury imposed a life sentence without parole for Defendant Williams's murder convictions. The trial court was to determine the sentence for the especially aggravated kidnapping conviction, a Class A felony. Because the Defendant was to be sentenced as a Range I offender, the sentencing range was fifteen to twenty-five years for the Class A felony. At the sentencing hearing on the especially aggravated kidnapping conviction, the trial court admitted the presentence report into evidence.

The State argued for imposition of the maximum sentence within the range based upon Defendant Williams's prior criminal history (enhancement factor (1)) and the exceptional cruelty during the commission of the offenses (enhancement factor (5)). T.C.A. § 40-35-114 (1) & (5) (2019). In support of consecutive sentencing, the State argued that Defendant Williams: (1) had an extensive record of criminal activity as evidenced in the presentence report; (2) was a dangerous offender; and (3) was serving a community corrections sentence at the time he committed these crimes. T.C.A. § 40-35-115 (2), (4), & (6) (2019).

Defendant Williams's attorney argued that Defendant Williams had confirmed the identity of the victim for the police and expressed remorse during the trial. He did not dispute his extensive criminal history or his service of a community corrections sentence at the time of these crimes but asked for concurrent sentencing.

The trial court stated that it had considered the evidence at trial, the parties' arguments as to sentencing, the presentence report, the principles of sentencing and the statistical information provided by the Administrative Office of the Courts. The trial court found applicable enhancement factor (5), that Defendant Williams treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense. *See* T.C.A. § 40-35-114 (5). The trial court also found applicable enhancement factor (6), that the personal injuries were particularly great and enhancement factor (10), that Defendant Williams had no hesitation about committing a crime when the risk to human life was high. *See* T.C.A. § 40-35-114 (6), (10). Finally, the trial court found enhancement (13) applicable, that Defendant Williams was serving a community corrections sentence at the time of this offense. T.C.A. § 40-35-114 (13). The trial court found no applicable mitigating factors, noting that none had been argued. Based upon these enhancement factors, the trial court ordered the maximum sentence in the range, twenty-five years for the especially aggravated kidnapping conviction.

The trial court then considered the criteria in Tennessee Code Annotated section 40-35-115, to determine whether Defendant Williams's sentences should run concurrently or consecutively. The trial court found that Defendant Williams was an offender whose record of criminal activity was extensive, that the Defendant was a dangerous offender whose behavior indicates little or no regard for human life, and that Defendant Williams was being sentenced for an offense committed while on community corrections. *See,* T.C.A. § 40-35-115 (b)(2), (4), & (6). Based on these factors, the trial court ordered the twenty-five-year sentence for especially aggravated kidnapping to run consecutively to his life sentence without parole for first degree murder and the unrelated community corrections sentence he was serving at the time of this offense.

### 1. Length of Sentence

Defendant Williams does not challenge the trial court's findings or application of the enhancement factors but maintains that he should have been sentenced to the minimum within the range, fifteen years.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2019).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d at 699 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

We conclude that the trial court properly exercised its discretion in ordering a twenty-five-year sentence for Defendant Williams's especially aggravated robbery conviction. The trial court considered the relevant principles and sentenced the Defendant to a within range sentence. Based on the evidence at trial and Defendant Williams's criminal history provided in the presentence report, the sentence imposed on the Defendant was not excessive, and the trial court did not abuse its discretion. Accordingly, we conclude that Defendant Williams is not entitled to relief.

## 2. Alignment of Sentences

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As it relates to this case, the trial court found the following criteria applicable:

(2) The defendant is an offender whose record of criminal activity is extensive; . . .

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; . . .

- 34 -

(6) The defendant is sentenced for an offense committed while on probation;

T.C.A. § 40-35-115. These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.; State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at \*19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed.* The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4) (2019).

We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3rd 851, 860 (Tenn. 2013).

The evidence supports the application of these consecutive sentencing criteria. The trial court properly applied criteria (1), that Defendant Williams had an extensive history of criminal activity. In addition to Defendant Williams's conviction for first degree murder and especially aggravated kidnapping, the presentence report reflects he had two prior felony convictions for selling drugs. Further, the unrefuted testimony at trial was that Defendant Williams was a drug dealer by primary occupation. Defendant Williams testified that he provided Mr. Poe with drugs to sell at the Night Deposit, and both Ms. Williams and Ms. Murphy testified to their participation as well as the victim's participation in Defendant Williams's drug enterprise. Ms. Williams also testified to Defendant Williams's personal drug use. As we previously mentioned, the consecutive sentencing criteria are listed in the alternative; therefore, only one need apply to support a trial court's imposition of a consecutive sentence. Accordingly, we conclude that consecutive sentencing in this case was not an abuse of discretion based upon the trial court's finding that Defendant Williams had an extensive history of criminal activity.

Nonetheless, our review of the record revealed that the trial court did not abuse its discretion when it found that the Defendant Williams was serving a community corrections sentence, criteria (6), at the time that he kidnapped and murdered the victim. The record further supports the trial court's finding applicable criteria (4), that Defendant Williams was a dangerous offender. Defendant Williams was angry at the victim for her role in Defendant Forman's arrest. He assisted in changing the locks to the Ashford Place apartment to prevent the victim's entry but then allowed her in to the home to be assaulted. Defendant Williams assisted in restraining the victim and then left the injured victim, for hours, unclothed, lying on the kitchen floor while he planned and prepared to set the victim on fire. Defendant Williams actively participated in the plan and transferring the victim to

the field where she would be killed. He cut open the tarp wrapped around her body to ensure the gasoline properly ignited so that the flames would consume the victim. The medical evidence at trial included that, the concentration of carbon monoxide in the victim's muscle tissue indicated that she inhaled smoke after the defendants set her on fire. Defendant Williams left the victim in the field to burn and returned to the Ashford Place apartment to remove any trace of the assault in the apartment. The victim was so severely burned that the medical examiner could not determine gender by viewing the remains. This evidence supports the trial court's finding that the Defendant is a dangerous offender. It further supports a finding that an extended sentence is necessary to protect society from further criminal conduct, and it reasonably relates to the severity of the offenses committed.

The trial court properly ordered the sentences to run consecutively because Defendant Williams had an extensive criminal history, was a dangerous offender whose behavior indicated little regard for human life and no hesitation about committing crimes in which the risk to human life was high, and was serving a community corrections sentence at the time of the offenses for which he was being sentence. *See State v. Lee*, 969 S.W.2d 414 (Tenn. Crim. App. 1997). The trial court considered the relevant principles and sentenced Defendant Williams to a within range sentence. Based on the evidence at trial, the sentence imposed on Defendant Williams was not excessive, and the trial court did not abuse its discretion. Accordingly, we conclude that Defendant Williams is not entitled to relief as to this issue.

### III. Conclusion

Based on the foregoing, the trial court's judgments are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE